**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | **CRIMINAL NO. PWG-19-243** |
| | * | |
| JOEL MUKONG, | * | |
| | * | |
| Defendant | * | |
| | * | |

**\*\*\*\*\*\*\***

<u>**GOVERNMENT'S OPPOSITION TO MOTION FOR RELEASE**</u>

On May 31, 2020, after originally consenting to detention, the defendant filed a motion for a detention hearing and pretrial release from D.C. Jail, where he is currently housed. The defendant is a serious risk of flight and danger to the community. The defendant is a citizen and national of Cameroon who is currently an illegal overstay in the United States, and thus has a pending immigration detainer. While in the United States illegally, the defendant preyed on both United States and international citizens by committing fraud that resulted in the attempted loss of over $6 million and the actual loss of almost $1 million—the latter of which Mukong is directly responsible for as he personally laundered those funds. The government's evidence against him is overwhelming, and the defendant has conspired with individuals both inside and outside of the United States—including in South Africa, Cameroon, Kenya and Europe—to victimize numerous innocent individuals with merely the use of a phone and the internet. Many of the defendant's international co-conspirators remain at large. Even after Mukong's co-conspirator, Aldrin Fomukong, was indicted and arrested in December 2017, *see United States v. Aldrin Fomukong et al.,* Crim. No. PWG-17-661, but before Mukong was indicted and arrested in May 2019, Mukong continued to commit unfettered fraud using a variety of fraud schemes, including business email compromise, puppy mill, and tire schemes—all by using nothing other than his phone and the

internet. There is no set of conditions that can reasonably ensure the defendant's presence for trial or the community's safety.

The government anticipates that the defendant will move for release based on, at least in part, claims related to the COVID-19 pandemic. The defendant is currently housed by the D.C. Department of Corrections ("DOC") at the facility commonly referred to as D.C. Jail. As this Court is well aware, this facility and its protocols for combatting the pandemic are under the current oversight of District of Columbia District Court Judge Kollar-Kotelly.[1] And to date, the measures instituted by DOC under the supervision of Judge Kollar-Kotelly have been effective, as the rate of positive detainees has dramatically decreased in the last few weeks. Accordingly, COVID-19 provides Mukong with no basis for release.

The Court should follow the decisions of numerous judges in this District and deny the defendant's release. *See, e.g.*, *United States v. Lee*, ELH-19-159 (D. Md. April 24, 2020), ECF No. 97 (Order by Judge Hollander), *United States v. Williams*, GLR-19-318 (D. Md. April 24, 2020), ECF No. 345 (Order by Judge Boardman), *United States v. Remarque*, PX-19-39 (D. Md. April 27, 2020), ECF No. 100 (Order by Judge Xinis), *United States v. Woodson*, GLR-17-658 (D. Md. April 27, 2020), ECF No. 94 (Order by Judge Sullivan), *United States v. Dorchy*, GLR-18-172 (D. Md. April 28, 2020), ECF No. 218 (Order by Judge Russell), *United States v. Doye*, TDC-19-88 (D. Md. April 28, 2020), ECF No. 105 (Order by Judge Chuang); *United States v. Garland*,

---

[1] As the Court is no doubt aware, on April 19, 2020, United States District Court Judge Kollar-Kotelly issued an opinion and order in *Banks v. Booth*, 20-cv-849 (D.D.C.) granting in part and denying in part a motion for temporary restraining order (TRO) in a lawsuit brought against D.C. Jail and the Central Treatment Facility ("CTF"), and ordering D.C. Jail and CTF to take particular remedial steps discussed further below. *See Banks*, 20-cv-849, ECF 48 and 49. Most importantly, for the purposes of the defendant's motion, Judge Kollar-Kotelly did not order the release of prisoners as a remedy under the TRO. See ECF 49, at 26 ("The Court is not ordering the release of any inmates currently detained in DOC facilities.")

*United States v. Wheeler*, CCB-19-455 (D. Md. April 30, 2020), ECF No. 28 (Order by Judge Copperthite); *United States v. Nelson*, DKC-20-38 (D. Md. May 1, 2020), ECF No. 93 (Order by Judge DiGirolamo); *United States v. Green*, RDB-20-59 (D. Md. May 4, 2020), ECF No. 21 (Order by Judge Copperthite); *United States v. Frazer*, PWG-19-545 (D. Md. May 4, 2020), ECF No. 48 (Order by Judge Sullivan); *United States v. Cleckley*, TDC-18-344 (D. Md. May 5, 2020), ECF No. 509 (Order by Judge Chuang); *United States v. Spencer*, GLR-19-400 (D. Md. May 5, 2020), ECF No. 93 (Order by Judge Russell); *United States v. Harris-Howell*, CCB-19-36 (ECF No. 425) (Order by Judge Boardman); *United States v. Chase*, JKB-19-0473 (D. Md. May 11, 2020), ECF No. 34 (Order by Chief Judge Bredar); and *United States v. Ojedokun*, PWG-19-228 (D. Md. May 12, 2020), ECF No. 49 (Order by Magistrate Judge Sullivan); *United States v. Raley*, PX-11-296 (D. Md. May 13, 2020), ECF No. 66 (Order by Judge Sullivan); *United States v. Marshall*, GJH-18-145 (D. Md. May 22, 2020), ECF No. 108 (Order by Judge Hazel); *United States v. Attia*, PWG-19-193 (D. Md. May 22, 2020), ECF No. 67 (Order by Judge Grimm).

## **Background**

On December 18, 2017, the defendant's co-conspirator Aldrin Fomukong and four others were charged in an Indictment with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1344, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). ECF No. 5. Each of the defendants were arrested shortly thereafter.[2] All charged defendants have since pled guilty to their roles in their respective conspiracies.

On May 13, 2019, the defendant was charged, along with co-defendant Raphael Jason Nana Chinji, with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). This indictment stemmed from the defendant's role in Fomukong's wire fraud and money laundering

---

[2] On March 12, 2018, a Superseding Indictment that included allegations with respect to a fifth co-defendant was returned.

schemes.  On June 2019, the defendant was arrested in Houston, Texas, where he resided.  After a hearing, the defendant was ordered detained in Texas, transported to the District of Maryland, and again ordered detained by agreement in Maryland.

On May 31, 2020, the defendant filed a motion for pretrial release. ECF No. 40. As detailed below, the motion should be denied.

## <u>Argument</u>

As discussed below, and as set forth in the report provided by Pretrial Services dated June 3, 2020, the defendant is a flight risk and a danger to the community.  As a result, the government expects that the defendant will rely on the COVID-19 outbreak at the D.C. Jail, which is the pretrial facility where he currently is housed, to secure the defendant's release.  While the government understands that, as of June 3, 2020, 206 DOC inmates have been diagnosed with COVID-19,[3] the vast majority (at least 188) of those inmates have now recovered and returned to general population, and the number of positive inmates has dramatically decreased.  Indeed, there were no new positive detainees between May 30 and June 2, 2020.  Moreover, as described further below, D.C. Jail continues to take precautionary measures to prevent further transmission of COVID-19 in D.C. Jail and treat those detainees who have tested positive, and DOC is now under the oversight of Judge Kollar-Kotelly pursuant to litigation before that court.  The defendant's motion for release should be denied.

---

[3] On April 13, 2020, a COVID-positive CTF detainee died.  According to a press report, the detainee was diagnosed with the virus on April 7, 2020, and placed in isolation before being transferred to a hospital.  According to a public court filing, the detainee was 51 years old, "has diabetes and has multiple health issues related to that diagnosis."  The detainee had been charged with first-degree murder in D.C. Superior Court.

I.        **Legal Standard**

The factors a court must consider in determining whether a defendant poses a danger to the community or a risk of flight include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).

Notwithstanding the directive in § 3143(a)(1), pursuant to 18 U.S.C. § 3142(i) the Court "may . . . permit the temporary release of [a defendant], in the custody of a United States marshal or another appropriate person, to the extent that the [Court] determines such release to be *necessary* for . . . [a] *compelling* reason" (emphases added).  The Fourth Circuit has interpreted § 3142(i) to require courts to balance: "the severity of the risk that the COVID-19 virus poses to the defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform Act factors, rises to the level of a 'compelling reason' for temporary release under 18 U.S.C. § 3142(i)."  *United States v. Creek*, No. 20-4251 (4th Cir. Apr. 15, 2020).

The "compelling reason" a defendant proffers is not to be viewed "in a vacuum."  *United States* v. *Cox*, 2020 WL 1491180, at *2 (D. Nev. Mar. 27, 2020).  Courts must balance the proffered reasons for release against those supporting a detention order.  *Id.*; *see also United States* v. *Santana*, 2020 WL 1692010, at *4 (M.D. Pa. Apr. 7, 2020).  "[A] defendant should not be entitled to temporary release under § 3142(i) based *solely* on" COVID-19 concerns.  *United States* v. *Clark*, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020) (emphasis added).

With respect to temporary release, it is the defendant who bears the burden:  he must show (by clear and convincing evidence) that if he is a flight risk and a danger to the community (as indeed he is), his individual concerns regarding COVID-19 outweigh those risks and provide a compelling "reason in his particular case that temporary release is necessary."  *Clark*, 2020 WL 1446895, at *2, *3; *accord United States* v. *Green*, 2020 WL 1873967, at *3 (D. Md. Apr. 15, 2020).

## II.        The § 3142 Factors Weigh Heavily in Favor of Detention.

In this case, an examination of the § 3142 factors demonstrates that the detention order should remain in place.

### A.        The Nature and Circumstances of the Offense and the Weight of the Evidence

The defendant is charged with conspiring with Aldrin Fomukong, Raphael Jason Nana Chinji, and others to commit money laundering in which the defendant and his co-conspirators helped launder funds—almost $1 million—stolen from more than 5 unwitting victims totaling more than $6 million in just over three months.  The wire fraud scheme involved Fomukong and others directing his co-defendants and other co-conspirators to register fictitious or shell companies, open fraudulent bank accounts, and then use those bank accounts to receive funds from victims who wired money into the accounts (referred to as "drop accounts") because they believed they were, for example, purchasing a home or paying off a business invoice.  Once the stolen money was in the drop accounts, Fomukong and his co-conspirators transferred the fraudulently obtained funds in layered transactions so as to make them appear legitimate. *See* ECF No. 86, at 10-14 (Fomukong Plea Agreement). Specifically, Fomukong and his co-conspirators laundered the funds by transferring or attempting to transfer the fraud money abroad, including to Cameroon (where both Fomukong and Mukong are from) and South Africa (where many of the defendant's

co-conspirators reside), making ATM withdrawals, transferring to other bank accounts, and obtaining large cashier's checks. While Fomukong and his co-defendants primarily lived on the East Coast, Mukong and his co-defendant Chinji lived in Houston, Texas. The roles of Mukong and Chinji within the money laundering conspiracy were to recruit individuals in the Houston, Texas area to register fictitious businesses in Texas. Once the businesses were registered, Mukong and Chinji provided the names of the businesses to Fomukong. Fomukong would wait until a fraudulent wire transfer had entered a drop account controlled by him or his co-conspirators, and then instruct the holder of the drop account to purchase a large denomination cashier's check made out to the business name given to him by Mukong and Chinji.

Once the cashier's check was obtained, either Fomukong and/or a co-conspirator would fly to Houston, Texas, where they would meet with Mukong and Chinji. Mukong and Chinji would then have the fictitious Texas business registrant cash the cashier's check at a local check cashing store. Mukong and Chinji would then receive a percentage of the proceeds of the cashier's check from Fomukong and disperse the rest amongst the co-conspirators, including those residing abroad (such as in South Africa).

The weight of the evidence is overwhelming, as the vast majority of the conversations Mukong and Chinji had with Fomukong and others about the fraud was captured and seized on Fomukong's phone in December 2017, Mukong's phone in May 2019, and corroborated by numerous co-conspirators.

For example, on or about May 1, 2017, a co-conspirator opened a drop account, TD Bank account x9646 ("TD Bank x9646"), in the name of Skyline Investments—a fictitious business. Between May 12, 2018 and May 21, 2017, Fomukong and Chinji had the following conversation on WhatsApp:

5/12/19:

Chinji:          40/40 barber link
                            Link sail consulting [unknown connection]
***

Chinji:          40/40 barber link

***

Chinji:          Use na this one if na only 93k (40/40 barber link)

***

5/18/19 (while Fomukong is in Houston):

Chinji:          [Mukong's address off Whittington Dr. in Houston, Texas]

Fomukong:   Send me Joel number
                    Ink rennet dat door
                    IDE gate bro

On or about May 17, 2017, after receiving a $75,000 wire transfer from Victim A into TD Bank x9646, a co-conspirator obtained a cashier's check in the amount of $70,000 made payable to 40/40 Barber Link. On or about May 17, 2017, Fomukong traveled from Baltimore, Maryland, to Houston, Texas, and met with Mukong and Chinji. On or about May 18, 2017, with the assistance of the defendant and Chinji, Individual 2 (a co-conspirator) cashed the $70,000 cashier's check made payable to 40/40 Barber Link at Business 1 in Houston, Texas.

At the direction of Mukong and Chinji, Individual 2 registered two fictitious businesses: 40/40 Barber Link and QPZYTK LINK CO, both in Harris County, Texas. These businesses are entirely fictitious and registered for the purpose of committing fraud. During an interview with law enforcement, Individual 2 stated that in 2017 he was living in an extended stay motel in Houston, Texas where he met an African male with a French/African accent he knew as "Mike" (later identified as Chinji). "Mike" was accompanied by another black male that Individual 2

8

described as a "quiet guy" (later identified as Mukong).  Chinji gave Individual 2 the name of QPZYTX LINK CO and drove him to the Harris County, Texas Clerk's office where he registered it.  Mukong and Chinji also drove him to a check cashing location in the Houston, Texas area where he negotiated multiple cashier's checks in the name of QPZYTX LINK CO.  In total, Individual 2 negotiated at least 8 checks made out to either 40/40 Barber Link or QPZYTX LINK CO totaling $585,500 at Business 1 between May 8, 2017 and June 26, 2017.  Each of these checks consisted of fraudulent proceeds.

As another example, on May 22, 2017, Fomukong's convicted co-conspirator Izou Digifa, *see* PWG-17-661, registered the fictitious business Mercatel Investment LLC in Maryland.   On May 23, 2017, Digifa also opened a SunTrust bank account ending in 4431 in that business name ("SunTrust x4431").  On June 7, 2017, SunTrust x4431 received an incoming wire transfer in the amount of $50,703 from a victim company in Colorado.

On June 9, 2017, Digifa purchased a cashier's check in the amount of $39,486 made out to SQT6 SOLUTION CO.  Digifa gave the check to Fomukong, who then traveled to Houston, Texas, where he met with Mukong and Chinji.[4]  The check was then deposited into a Capital One bank account ending in 6452—an account opened by Individual 1.

During an interview with law enforcement, Individual 1 told investigators that, similar to the recruitment of Individual 2, in 2017 Individual 1 was living at an extended stay motel in Houston, Texas when she was approached by two African males that she knew as "Mike" and "Mike's brother" (later identified by photograph as Chinji and Mukong).  Individual 1 said that Chinji told her he would pay her to open bank accounts and businesses in names that he would give her.  Individual 1 agreed and rode with Chinji and Mukong to the Harris County, Texas

---

[4] A chat from Mukong's phone illustrates Mukong and Fomukong discussing Digifa and Mercatel.  *See* Exhibit 3.

Clerk's office where she registered the business SQT6 SOLUTION CO.  Individual 1 said she was also driven to a Capital One Bank branch where she opened an account in the name of SQT6 SOLUTION CO.  After opening the bank account she gave all of the paperwork and debit cards to Chinji and Mukong.  She confirmed that checks were deposited into her bank account and that she also assisted Chinji and Mukong was cashing cashier's checks at Business 1.

As yet another example, on June 7, 2017, Co-Conspirator A opened a Bank of America account ending in 7760 in at a Bank of America branch in Marlborough, Massachusetts ("BOA x7760").  The account had minimal activity until June 15, 2017 when it received an incoming wire transfer in the amount of $227,000 from a Bank of America account belonging to an individual victim.  The victim told law enforcement that he was attempting to purchase a home in California, and was trying to send $227,000 to a Title Company in California to complete the purchase.  He had unknowingly received false wiring instructions via email which resulted in the victim sending a false wire transfer in the amount of $227,000 to BOA x7760 on June 15, 2017.  After the wire transfer entered the account, the co-conspirator conducted several transactions including the purchase of Bank of America Cashier's Check No. 1068905338 in the amount of $90,000 and Bank of America Cashier's Check No. 1242008361 in the amount of $95,000.  Both checks were purchased in the Dallas, Texas area on June 16, 2017 and made out to SQT6 SOLUTION CO (which was fraudulently registered by Individual 1, as directed by the defendant and Chinji).  Both cashier's checks were negotiated at Business 1 stores in Houston, Texas.  The checks were endorsed with Individual 1's name on them.

During an interview with law enforcement, Co-Conspirator A stated that he had been recruited to open BOA x7760 by Carlson Cho, who has since pled guilty.  *See* PWG-17-661.  Co-Conspirator A said that after the wire transfer entered the account, Cho told him they had to go to

Texas because Cho knew someone who could cash checks. This is confirmed by text messages between Fomukong and Cho in which Fomukong instructs Cho to fly to Houston and provided him with Chinji's phone numbers.  Co-Conspirator A then flew to Dallas, Texas with Cho, where they purchased the cashier's checks listed above.  They then flew to Houston, Texas.  Once in Houston, Texas, Co-Conspirator A and Cho, along with Fomukong, met Mukong and Chinji and gave them the cashier's checks.

During this time frame, the defendant, Fomukong, and Chinji participated in a three-way WhatsApp chat, which included the following:

6/16/17

Mukong:



Fomukong:     Kfrm

Fomukong:     SQT6 Solution CO

Mukong:       Yup

Fomukong:     K

Fomukong:

Mukong:       Kfrim

Mukong:       Albanky don dowam gain



Fomukong:

*See* Exhibit 2 (the entirety of the WhatsApp three-way conversation).

On June 15, 2017, convicted co-conspirator Yanick Eyong, *see* PWG-17-661, registered the business CL Escrow with the state of Maryland. Eyong then opened a Bank of America account ending in 0042 ("BOA x0042") in that name on June 17, 2017.  On June 21, 2017, BOA x0042 received an incoming wire transfer in the amount of $6,000,000 from a victim company in Boston, Massachusetts, which informed law enforcement that it had been the victim of a business email compromise scheme which had caused them to send the wire transfer.

On June 21, 2017, Fomukong sent the defendant and Chinji an audio clip regarding the $6 million account balance, to which Chinji responded "QPZTYX LINK CO."  On June 23, 2017, the following discussion occurred on the three-way WhatsApp chat:

Fomukong:     Qpzytx link co

Fomukong:     Na dis one right

Fomukong:     Make ie de under

| Chinji: | Just do all for de |
|---|---|
| Chinji: | NJo use the name again |
| Chinji: | Are mean the personal name |
| Chinji: | Do all under the Qpzytx link co |

*See* Exhibit 2.

On June 22, 2017, Eyong obtained three cashier's checks from BOA x0042, namely, a $95,000 check made payable to Individual 6, a $95,000 check made payable to QPZTYX LINK CO., and another $95,000 check made payable to QPZTYX LINK CO.  On or about June 23, 2017, Eyong obtained three additional cashier's checks from BOA x0042, namely, three $95,000 checks, each made payable to QPZTYX LINK CO. On or about June 26, 2017, with the assistance of Chinji and Mukong, each of the $95,000 cashier's checks made payable to QPZTYX LINK CO. was negotiated at Business 1 in Houston, Texas.

In total, the defendant laundered via cashier's checks to the three fictitious business registered by Individual 1 and Individual 2 at least $929,986 of funds stolen from just five victims between April and June 2017.

### B.     History and Characteristics of the Person

Although this federal case will be Mukong's first criminal conviction, there is substantial evidence that he has been committing fraud unabated since shortly after he arrived in the United States, and continuing through 2018 up until his arrest.  Notably, Mukong continued to commit unabated fraud even *after* Fomukong's and his co-defendant's arrests and guilty pleas in December 2017 and early 2018, suggesting that the defendant simply will not be deterred by the prospect of imprisonment.

Specifically, as reflected in the defendant's Pretrial Services report, the defendant arrived in the United States in January 2016, on a full-time student visa.  The defendant enrolled in Oklahoma City Community College in Oklahoma, but then failed to enroll again in February 2017, becoming an illegal visa overstay.  At some point thereafter (or perhaps before), the defendant relocated to Texas.  Furthermore, in November 2016, the defendant filed a false asylum application in which the defendant indicated that he resided at an address in Maryland.  Not only was the defendant purportedly in school in Oklahoma City at the time, but he also has never resided in Maryland.  More importantly, the Maryland address the defendant put on his asylum application is associated with an individual who is the repeated target of investigation by immigration authorities for being a facilitator of fraud in immigration court.  Then, again in April 2018, the defendant attempted to change his status by purporting that he was married to a United States citizen—a claim that does not appear to be supported by the defendant's proposed third party custodian and one for which there is no additional evidence.  In any event, that application was denied in December 2019.

Furthermore, while illegally present in the United States, in addition to the fraud committed with Fomukong as described above and as alleged in the indictment, the defendant actively engaged in various additional fraud schemes until the very moment of his arrest.  On the day of Mukong's arrest in May 2019, law enforcement also executed a search warrant at Mukong's residence—a residence that is not set forth in the defendant's Pretrial Services report—and seized Mukong's phone.  To illustrate some examples of the defendant's widespread and continuing fraud, the government attaches as Exhibits 4 – 10 (under seal) the following chats which were obtained from the defendant's phone that was seized on the date of his arrest.  Mukong is the phone number ending in 3162.  As further described below, the following chats indicate that the defendant

continued to engage in fraudulent activity, including business email compromise schemes, past December 2017, when some of Mukong's co-conspirators (including Fomukong) were arrested. Indeed, in May 2019—just days before his arrest—Mukong confirmed that he was still involved in the "bank stuff." And, importantly, the country code for many of the phone numbers on these chats are from countries outside the United States, including Cameroon (country code +23), Kenya (country code +254), Germany (country code +49), and Hungary (country code +36).[5]

- Exhibit 4: During this chat from September 12, 2018 to September 26, 2018 with an individual located in Cameroon, Mukong and his co-conspirator discuss bank account, wire transfer, and social security information regarding a business email account compromise where an account (CA Copagirl) received a fraudulent wire resulting in $128,000 loss. *See, e.g.,* pages 3, 5, 8, 17, 22. The photos exchanged include photos of the wire transfer outgoing request for $128,735, a photo of a computer screen showing the same wire transfer outgoing request, and an email from a victim indicating that he has initiated a $74,750 wire. As such, Mukong was clearly involved in both the wire fraud and money laundering portions of the scheme.

- Exhibit 5: During this September 27, 2018 to November 23, 2018 chat with an individual with a Cameroonian country code, Mukong and his co-conspirator discuss multiple wires and the business email compromise scheme that involved a bank account in the name of fictitious businesses TCT INT COM (*see, e.g.*, pages 5, 34, 36, 57, 58); JQW ESTATE TITLES (*see., e.g.* pages 11, 21); Meridian

---

[5] For the Court's convenience, particularly relevant portions of the chats are highlighted and pages are referenced herein.

Atlantic Trading LLC (*see, e.g.,* page 53); and Gks Estate Title LLC (*see, e.g.,* pages 58).  The two also discuss needing the stolen funds to support their travel. *See, e.g.,* pages 57, 72.  The photos exchanged in the chat include a photo of the "wire details" for a $700 wire from New Hampshire to TCT INT COM in Houston.

- Exhibit 6:  In this chat from September 18, 2018 to December 8, 2018, Mukong and a co-conspirator from Kenya engage in the extensive exchange of bank information (*see, e.g.,* 6, 7, 24, 27, 44, 50) and discuss accounts being "burned" because the incoming wires were flagged by bank investigators (*see, e.g.,* pages 1-2, 14-15, 16).  The two also discuss moving money to the co-conspirators using a variety of methods, including Zelle, World Remit (to Kenya), PayPal, CashApp, and bitcoin.  *See, e.g.,* pages 18, 24, 29, 31, 34-35, 52, 55, 59.  It appears from the conversation that money was sent to South Africa (*see* pages 18-19) and Kenya (*see* pages 84, 86, 91, 97).  As specific examples, on September 19, 2018, Mukong indicates that he sent $500,000 (*see* page 9), and on November 5, 2018, the co-conspirator asks for an account to put a $25,000 or greater wire into (*see* page 50).

- Exhibit 7:  In this chat dated May 10, 2019—just days before the defendant's arrest—an individual inquires whether Mukong is still doing the "bank stuff" to which Mukong confirms "Yup."

In addition, chats from Mukong's phone indicate that he was involved in fraud schemes other than just business email compromise schemes (often with the same individuals), including a puppy mill scam and a non-delivery tire scam.

- Exhibit 8:  In this chat from July 20, 2018 to October 7, 2018, Mukong and a co-conspirator extensively discuss Mukong paying for and sending domains used in

16

puppy fraud, and discuss new domains when the others become burned. *See, e.g.,* pages 6, 13, 18 – 22, 25, 30-31, 33, 37-38, 44.

- Exhibit 9:  In this chat from September 8, 2018 to December 7, 2018, Mukong corresponds with a co-conspirator in in Hungary.  *See* page 77 ("U b international").  The two discuss multiple fraud schemes, including the websites used for puppy scams (*see, e.g.* pages 8, 10-12, ), business email compromise activity (including from Chile involving the TCT INT COM account), the defendant's laundering of those funds via ATM and other withdrawals (*see, e.g.*, pages 18-21, 26-34, 59, 67), and moving money to Cameroon and to others (*see, e.g.,* pages 37 ("Find person weh get money for Cameroon weh need money for here"), 52).  The two specifically talk about sending fraudulent invoices pursuant to a business email compromise scam.  *See* page 72.

- Exhibit 10:  This conversation took place from September 18, 2018 to December 6, 2018 and is between Mukong and a German-based co-conspirator.  The two trade account numbers and the receipt of money (including from Chile and Canada) (*see, e.g.,* pages 3-4, 22, 24-25, 101) and discuss a non-delivery tire scam and fish scam based in Europe (*see, e.g.*, page 31, 44, 52).

Mukong's significant ties to foreign countries are another factor weighing in favor of detention.  Specifically, the government understands that the defendant's immediate family all reside in Cameroon, including his mother, father, and siblings.  The defendant has a Cameroonian passport.  The defendant also reported in his Visa application that his brother has studied in Germany.[6]   Moreover, as discussed above, the defendant's co-conspirators—many of whom

---

[6] Mukong's brother's whereabouts are currently unknown to the government.

remain at large—either reside in or have connections to foreign countries, including Cameroon, South Africa, Kenya, Germany, and Hungary.  Indeed, much of the money involved in the defendant's crimes was funneled back to these foreign countries.

Furthermore, the defendant's ties to foreign countries is especially troublesome given that Mukong has no lawful status in the United States and continues to have an outstanding ICE detainer.[7]  *See* Ex. 1 (Immigration and Customs Enforcement (ICE) detainer).  There can be no doubt that flight from prosecution would be an attractive option to Mukong if he were released: he could at that point either (1) remain in the United States (likely in ICE detention[8]) pending the conclusion of this case; serve a sentence upon conviction for the federal crimes with which he has been charged; then be subject to deportation in light of his convictions; or, instead, (2) reconnect with his family members who all reside in Cameroon; and/or, reconnect with co-conspirators who would be motivated to have him out of the United States in a position where he could be potentially cooperating or otherwise providing information to the government; and, flee, live out his life in any country of his choosing.  Having lived under the radar in the United States unlawfully for many years, now more than ever Mukong's foreign contacts in both his home country and elsewhere establish that he is a risk of flight.

---

[7] Courts in this Circuit routinely hold that a detainer is one factor to be considered under the Bail Reform Act, though it is not dispositive.  *E.g., Attia,* PWG-19-193, ECF No. 67; *United States* v. *Suastengui*, 2018 WL 3715765, at * 5 (W.D. Va. Aug 3, 2018); *United States v. Coreas-Batres*, 2018 WL 10561963, at * 2 (E.D.N.C. Dec. 4, 2018); United *States* v. *Leyva-Rodriguez*, 2011 WL 52436, at * 2 (E.D.N.C. Jan. 4, 2011); *see also Attia II*, at *2.

[8] The government understands that, if Mukong were released from USMS custody and space were available at an ICE detention center, then HSI may seek to detain Mukong pending the conclusion of this case.  Whether or not Mukong would, in fact, remain detained by immigration authorities appears to be a decision that will made by HSI and/or an immigration judge.

**C.     The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release**

Although the defendant has a minimal criminal history, the sheer volume and scope of the offenses charged demonstrate his ability quickly to inflict substantial economic harm.  Such harm is squarely contemplated to constitute "danger to the community" as used in the Bail Reform Act. S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3195 (Congress "intend[ed] that the concern about safety [to the community] be given a broader construction than merely danger of harm involving physical violence").  The fraud conspiracy charged spanned less than four months, yet Mukong and his co-conspirators laundered nearly $1 million in fraud proceeds during that period from just five victims.  And, this was only a fraction of the over $6 million that was fraudulently obtained or attempted to be obtained from those same five victims.   Furthermore, many of the co-conspirators identified in the chats above, as well as many others, are currently at large and thus Mukong could easily go back to committing the fraud he has perpetrated up until the day of his arrest.

In that regard, while the scheme alleged is sophisticated in that it involves layered transactions and fictitious entities, it was committed with the most basic of tools—cell phones and access to the internet.  In the best circumstances, preventing a defendant's access to these items is difficult.  *See United States* v. *Schenberger*, 498 F. Supp. 2d 738, 744-45 (D.N.J. 2007) (even though defendant "agree[d] not to use or access a computer, this condition of release is difficult to enforce").  Now, however, the United States Probation Office has suspended traditional location monitoring, such as an ankle bracelet, and instead now employs other location monitoring technologies, including SmartLink, VoiceID, and Home Incarceration by Phone.  These methods are inadequate because (1) they would not monitor the defendant's location in real time; and (2) these alternative technologies require the use of a telephone and internet access at the defendant's

residence.  And, because the electronic monitoring does not monitor the defendant's location in real time, but rather determines his location only on a periodic basis, the defendant could flee the residence and/or jurisdiction without the officer knowing the defendant was no longer at the home until the next check-in—which could happen hours after the defendant's departure.

Furthermore, electronic monitoring simply is not a replacement for incarceration, as home monitoring does not prevent others from coming to the defendant's residence, which increases the risk of the defendant violating the law, as well as his exposure to COVID-19.  *See, e.g.*, *United States* v. *McKenzie*, 18-834 (PAE), ECF 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others).

Mukong's proposed third party custodian—if the defendant were to be released from ICE custody in the first place—is also inadequate to mitigate concerns relating to non-appearance and danger.  To the extent it is relevant, Pretrial Services reports that Mukong's proposed third party custodian, an extended family relation, has no criminal history and a home in New Jersey. However, it is also clear that the proposed third party custodian is only a distant relative with limited knowledge of the defendant, will not be in the home during the day to monitor the defendant's activity or whereabouts, may be at heightened risk for complications of COVID-19, and is unable to provide transportation for the defendant to and from New Jersey if he were to be released.   As such, the government submits that the proposed third party is not suitable under the circumstances.

In short, there is no condition or combination of conditions that would mitigate the risk of flight and danger to the community Mukong presents.

III.     **D.C. Department of Corrections Has Established Procedures with Respect to the COVID-19 Outbreak that Are Now Being Overseen by the United States District Court for the District of Columbia.**

The government anticipates that the defendant will rely at least in part on the health risks posed by COVID-19 to support his release.  To be sure, the Bail Reform Act instructs courts to consider the "physical and mental condition" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A).  Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release.  Notably, the defendant in his motion does not allege that he has COVID-19 and any underlying conditions that make him particularly vulnerable to the disease.  As discussed below, moreover, DOC, which oversees the D.C. Jail and CTF, has implemented precautionary measures to mitigate this risk, continues to evolve its policies and procedures to address the unprecedented COVID-19 pandemic, and is being closely supervised in its ongoing efforts as part of the *Banks* litigation in the United States District Court for the District of Columbia.

A.     **DOC Has Instituted Precautionary Measures to Avoid Further Transmission of COVID-19 and Ensure Adequate Medical Care for Those Infected.**

DOC has implemented a number of precautionary measures based on guidance from the D.C. Department of Health and the Centers for Disease Control ("CDC") to mitigate the risks associated with COVID-19, including restrictions on visitation to the facility, screening and quarantine of inmates, increased provision of masks and other personal protective equipment ("PPE") to staff and inmates, continued education of staff and inmates about the spread of COVID-19 and ways to combat it, cancellation of group activities, and restrictions on out-of-cell time.  As

21

additional measures are implemented, DOC continues to alert the public. *See* https://doc.dc.gov/page/coronavirus-prevention.[9]

The Government acknowledges that Judge Kollar-Kotelly found that many of DOC's measures prescribed by policy have not been properly implemented (at least as of the time independent inspectors visited the facility on three occasions between April 10 and April 12), further measures are needed, and further education of staff and inmates regarding the measures that exist is necessary. *See generally*, *Banks*, Mem. Op., ECF 49.  Notably, however, Judge Kollar-Kotelly declined to grant the requested injunctive relief of releasing prisoners. *See id.* at 26.

As Judge Kollar-Kotelly recognized, "COVID-19 poses an unprecedented challenge and the precautionary measures taken by [DOC] are rapidly evolving." *Banks*, Mem. Op., ECF 49, at 16; *see also id.* at 15 (recognizing that DOC's "response to this sudden and unprecedented pandemic is ongoing").  With the recognition that DOC's response continues to evolve, Judge Kollar-Kotelly issued an extensive order to remediate the deficiencies in DOC's implementation of its policies, including: ensuring proper triage process for sick call requests; ensuring medical staff are promptly informed of inmates who present with symptoms of COVID-19; providing better documentation of sick calls and the outcomes of same; ensuring proper monitoring of cell restrictions; ensuring appropriate housing for inmates in quarantine; consulting with public health professionals regarding strategies that can be implemented to strengthen COVID-19 related education; conducting additional staff training on use of thermometers; providing consistent and reliable access to legal calls; ensuring proper social distancing; ensuring proper use and

---

[9] The DOC webpage is updated regularly with announcements, policy descriptions, and answers to frequently asked questions.

communication to staff regarding use of PPE; strengthening the environmental health and safety program; assessing whether any additional security staff are needed to provide appropriate supervision for social distancing; and ensuring that all inmates, including those on isolation, have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters. *See Banks*, Order, ECF 48; *see also* Mem. Op., ECF 49, at 27-31. [10]

On June 1, 2020, the United States Marshal Service reported that, between March 15 and May 29, 2020, the DOC has tested 712 inmates, with two additional inmates who were offered testing but refused. Moreover, on May 22, 2020, DOC and DC Health conducted a COVID-19 Point Prevalence Survey on a random sample of inmates housed in both CTF and D.C. Jail. As a result, a total of 306 residents were tested, with 12 residents testing positive and immediately receiving the necessary care for their diagnoses.

Indeed, many judges in this district have recognized that "DOC has implemented substantial measures at CTF to protect detainees from COVID-19 and to treat those who are infected." *Lee*, ELH-19-159, ECF No. 97, at 14 (listing modified procedures implemented by DOC). Furthermore, "in this rapidly evolving situation, new information concerning the virus emerges at break-neck pace, and DOC has repeatedly revised its procedures." *Id.* at 14. *See also Dorchy*, GLR-18-172, ECF No. 218 at 4 n.2 (noting that the court in *Banks* "has not ordered that

---

[10] On April 17, 2020, DOC Director Quincy L. Booth also issued a memorandum to all employees and contractors entitled "Reminders and Updated COVID-19 Policies and Procedures." *See Banks*, Report Submitted by *Amicus Curiae* Pursuant to April 9, 2020 Consent Order, ECF 47, Ex. 11. Director Booth's memorandum, which directly addresses many of the concerns raised by the independent inspectors as part of the *Banks* litigation, both reminds staff of existing procedures and provides several updated procedures, including enforcing social distancing, restricting residential out of cell time, increased education about and use of personal protective equipment, improved conditions within isolation units (including showers and access to legal calls), improvements related to unit common area and cell cleaning, improvements to linen and laundry exchanges, increased contractor and staff screening and hygiene, increased access to legal calls, identification of those in need of medical care, and additional measures. *Id.*

all inmates be released" and that "at least one other judge has noted that because D.C. jail facilities are the subject of Judge Kollar-Kotelly's temporary restraining order, it can be expected that the D.C. Department of Corrections 'will do everything it can to comply with that order so as to prevent the further spread of the virus to its residence and staff'" (quoting *United States v. Sagastume-Galicia*, No. 20-40 (BAH), 2020 WL 193555, at *5 (D.D.C. Apr. 22, 2020)); *Spencer*, GLR-19-400, ECF No. 4 (noting same and reversing magistrate judge's release order).

Furthermore, as reflected by the slowed rates of positive inmates, the conditions at DOC facilities have already demonstrably improved. The *Banks* inspectors provided an oral report to the D.C. Court on May 11, 2020. The May 11 hearing focused on the inspectors' answers to a series of questions posed by the Court.[11] In sum, in the government's view, the May 11 hearing indicates that conditions at the D.C. DOC facilities are improving and that DOC is making substantially improved efforts to curtail the spread of COVID-19 within their facilities.

There are, of course, areas in which DOC continues to strive to improve. However, the government submits that the following facts are paramount:

- The rate of infection and spread of COVID-19 has *dropped* since its mid-April 2020 peak.

- Inmates in isolation and quarantine are receiving a high-rate of medical treatment and observation. The vast majority of isolation/quarantine inmates are being seen by medical professionals multiple times per day for medical checks ups and/or temperature checks.

- Overall living conditions for inmates in isolation have improved. Attorney and personal calls are being provided, and inmates are afforded out-of-cell time and shower time. The system is not perfect, and out-of-cell time is sometimes disrupted by, among other things, inmate fights and non-compliance.

---

[11] As before, the inspectors had conducted site visits at the DOC facilities, both the D.C. Jail and CTF. Also as before, the inspectors advised the Court that the D.C. Department of Corrections had been thoroughly cooperative in the providing of information.

- Cleaning supplies appear to have become more available generally, especially at CTF.  Distribution and availability sometimes remains an issue at the D.C. Jail.

- The DOC should continue to look for ways to improve the attorney call system (particularly in non-quarantine units) and the availability of medical care and responsiveness in the non-quarantine units.

Indeed, as Judge Grimm recognized, "[t]he conditions at CTF have improved, such as inmates' increased access to medical care who are in isolation and quarantine and increased access to cleaning supplies and equipment." *Attia*, PWG-19-193, ECF No. 67 at 7-8.

In short, the DOC's response to this unprecedented pandemic is rapidly evolving as it endeavors to implement measures recommended by the CDC and D.C. Department of Health, as well as the series of measures ordered by Judge Kollar-Kotelly.  COVID-19 is not a problem that afflicts DOC facilities alone, and DOC continues to improve its response to the outbreak in its facilities.  The defendant has not shown that any risk he faces of contracting COVID-19 within DOC facilities merits release when weighed against the other Bail Reform Act factors this Court must take into account and the continued corrective measures being implemented by DOC.  *See Remarque,* PX-19-39, ECF No. 100, at 6-7 ("Finally, this decision in no way minimizes the unprecedented threat that COVID-19 has befallen on our community, country, and world, including places of confinement. For some individuals, the virus visits profound suffering, illness, and even death. This cold reality, however, does not permit the Court to cast the Bail Reform Act aside, but rather to follow it with special care to the individualized circumstances presented. When doing so here, the balance simply does not tilt in favor of Remarque's release."); *Lee*, ELH-19-159, ECF No. 97, at 13-14; *Gray*, GJH-19-0407, ECF 120 ("COVID-19 is not a virus that has specifically attacked the D.C. Jail but, rather, a global pandemic that all citizens of the world are struggling to combat.  There is no reason for the Court to believe that the jail is not taking reasonable precautions to prevent spread within the facility nor is there reason to believe that [the

defendant] would not be provided with appropriate medical care if he were unfortunate enough to join the hundreds of thousands of people who have been inflicted with the virus.").

Moreover, Judge Kollar-Kotelly's Order specifically denied the *Banks* plaintiffs' request for the release of prisoners as not called for by the record.  *See, e.g., Banks*, ECF 49 ("The Court is not ordering the release of any inmates currently detained in DOC facilities.").  The *Banks* Order instead imposed specific remedies for the specific deficiencies noted in that case.  As Judge Xinis recently noted, "although the D.C. District Court indeed found at this stage a likelihood that the *Banks* plaintiffs may establish Eighth and Fifth Amendment violations at D.C. Jail, that court also addressed the present harms through injunctive relief which does *not* include release or transfer of the detainees.  Even if this Court were to accord the D.C. decision the weight that [the defendant] urges, so too would it credit that release is simply not compelled as a result." *Remarque*, PX-19-39, at 6.  *See also Dorchy*, GLR-18-172, ECF No. 218 at 4 n.2; *United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day) (acknowledging that DOC has taken significant measures to stem the tide of the pandemic, and recognizing that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly."); *United States v. Cleckley*, TDC-18-344 (D. Md.), ECF No. 485 (Order by Judge Chuang) ("If the conditions prove to be unacceptable, the solution for [the defendant] will be for the Court to require improvements to the conditions or to have him moved to another detention facility, not to order [the defendant] to be released into the community.")  Indeed, as Judge Sullivan recognized in *Frazer*, Judge Kollar-Kotelly herself, "who is perhaps the judge best situated to understand the current conditions at the D.C. Jail and CTF, has recently denied a defendant's request for temporary release from the D.C.

Jail on the grounds that the defendant had failed to present individualized reasons for why release was necessary in his case." *Frazer*, PWG-19-545, ECF No. 48 at 5 (citing *United States v. Riggins*, No. 20-10 (CKK), 2020 WL 1984263, at *9 (D.D.C. Apr. 27, 2020)).

With respect to the DOC detainees who have tested positive, DOC's medical team and Unity Health Care continue to work with the D.C. Department of Health ("DOH") on contact tracing and to protect the health and wellbeing of other DOC detainees. As part of these measures, DOC has implemented various levels of quarantine, depending on the inmates' symptoms and potential contact with infected individuals. Moreover, while the defendant points to the numbers of detainees who have tested positive, and the rate at which the numbers have increased, as Magistrate Judge Day has recognized, "medical experts have universally and correctly predicted that the raw numbers of those who would be infected would multiply. This fact has borne true no matter when in the country the virus has appeared. . . . Merely casting numbers about the rising infection rate, without more, is not helpful." *United States v.* Ray, TDC-19-215 (D. Md.), ECF No. 76, at 4 (Order by Magistrate Judge Day). And, as this Court recently recognized:

> It is tempting to quantify that risk by comparing the infection rate at the D.C. Jail to the overall infection rate in the surrounding region. As has been seen however, different groups, even within the same region, experience infection in different ways due in part to geography, demographics, health status, socio-economic status and the traditional barriers to health care. Moreover, a lack of available testing may understate the true rate of infection. Finally, risk of infection is also a function of one's ability and willingness to follow the directives of public officials and the recommendations of public health experts.

*United States v. Hernandez*, PX-19-158 (D. Md. April 29, 2020) (Order granting release). Moreover, as of June 2, 2020, at least 188 DOC detainees who previously tested positive for COVID-19 have since recovered and are no longer in isolation. And, and perhaps most importantly, the rate of inmates testing positive has dramatically slowed—over the last weeks,

many days have passed between reports of positive detainees.  *Attia*, PWG-19-193, ECF No. 67

("The rate of infection at CTF peaked on April 5 and began to decline on April 16.")

**<u>Conclusion</u>**

For the foregoing reasons, the Court should deny the defendant's motion for release.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/
Kelly O. Hayes
Assistant United States Attorneys