IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. PWG-19-243 |
| | * | |
| RAPHAEL JASON NANA CHINJI, | * | |
| | * | |
| | * | |
| ******* | | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned counsel, hereby submits its sentencing memorandum in anticipation of the defendant's sentencing currently scheduled for February 25, 2021 at 10:30 a.m.

## Background

The defendant, Joel Mukong, was a member of a large-scale business email compromise and money laundering scheme that involved co-conspirators located throughout the United States, including Houston, Texas, where the defendant resided, and abroad. As this Court is aware from its familiarity with the related case, *United States v. Aldrin Fomukong et al.,* PWG-17-661, victims throughout the country were defrauded into wiring millions of dollars to "drop accounts," which were bank accounts opened by Fomukong and his co-conspirators. Once the money was in the drop accounts, the co-conspirators sought to quickly disburse the funds prior to and in order to avoid detection by the victims and law enforcement. One significant method of disbursing the funds—and therefore completing the fraud scheme—was by obtaining cashier's checks in large amounts and cashing those checks in places outside of Maryland. Mukong and his co-defendant, Raphael Jason Nana Chinji, were responsible for assisting with this portion of

1

the scheme. Specifically, Mukong and Chinji recruited individuals in Texas (Individual 1 and Individual 2), to register fictitious businesses in Texas, providing the individuals with the fake business name and paying the individuals money in exchange for doing so. Mukong and Chinji drove the individuals to the clerk's office to register the businesses and, in the case of Individual 1 and SQT6 SOLUTION CO, to a Capital One Bank to open a fictitious bank account in the business's name.[1] Individual 1 registered SQT6 SOLUTION CO and Individual 2 registered both 40/40 Barber Link and QPTZYX LINK CO.

Then, when victim funds were about to enter a drop account, or just recently entered an account, Fomukong would reach out to Chinji and Mukong and ask for one of those fake business names. The defendant would then provide those fake businesses to Fomukong and other co-conspirators, who then would obtain hundreds of thousands of dollars in cashier's checks in the name of those fake businesses. Once Fomukong and his co-conspirators had the cashier's checks in hand, the co-conspirators would travel from the East Coast (primarily Maryland) to Texas (primarily Dallas and Houston), where they would ultimately meet with Mukong and Chinji in Houston, Texas. Once Fomukong and/or the other co-conspirators were in Texas, Chinji and Mukong would then assist the co-conspirators by cashing the checks at various Business 1 locations throughout Texas. Individual 1 and Individual 2 also assisted Chinji and Mukong with cashing the checks at Business 1. Chinji, Mukong, and the co-conspirators would

---

[1] After opening the bank account, Individual 1 gave all of the paperwork and debit cards to Chinji and Mukong.

then split the checks. Using this general method, Mukong was responsible for laundering the following funds from at least five victims[2]:

| Victim | Drop Account | Victim Funds Into Account | Total Victim Funds Out of Account | Cashier's Checks Out of Account | Business Name |
|---|---|---|---|---|---|
| A | Skyline Investments | $75,000 | $75,000 | $70,000 | 40/40 Barber Link |
| B | AGridwell Global | $250,870.65 | $250,870.65 | $65,500 | QPZYTX LINK CO |
| C | Mercatel | $50,703 | $50,703 | $39,486 | SQT6 SOLUTION CO. |
| D | Individual 5 Trading | $227,000 | $203,371.98 | $185,000 (one $90,000 check and one $95,000 check) | SQT6 SOLUTION CO. |
| E | CL Escrow | $6,000,000 | $589,812 | $570,000 (six separate $95,000 checks) | QPZYTX LINK CO |
| Total | | $6,603,573.65 | $1,169,757.63 | $929,986 | |

Moreover, the defendant's intended loss was not limited to just the cashier's checks. Indeed, as set forth in the Declaration of Special Agent Darren R. Rusakiewicz in Support of the Government's Sentencing Memorandum (the "Rusakiewicz Declaration"), attached hereto as Exhibit 1, after Victim E wired $6 million into the CL Escrow LLC drop account, Fomukong sent Chinji and Mukong an audio clip indicating that there was a $6 million account balance, to

---

[2] In total, Individual 2 negotiated at least 8 checks made out to either 40/40 Barber Link or QPZYTX LINK CO totaling $585,500 at Business 1 between May 8, 2017 and June 26, 2017, not all of which are included in the agreed-upon loss amount set forth below.

3

which Chinji immediately responded (on the same three-way chat) with one of the fictitious businesses: "QPZTYX LINK CO." Of those funds, the conspirators thereafter obtained and cashed six separate cashier's checks, each in the amount of $95,000, for a total of $570,000.

In total, for Victims A through E, Fomukong and his co-conspirators successfully obtained wires totaling over $6.6 million, of which $1.16 million was not recovered by the banks or other methods. Of the $1.16 million that was not recoverable, almost $930,000 of that was due to Mukong's involvement in the scheme—**over 80% of the total actual loss**. As such, Mukong's role in the scheme—and the loss to the victims—was significant and cannot be understated.

## The Guidelines

Mukong pled guilty without the benefit of a plea agreement. However, in the defendant's statement of facts and proposed guidelines calculations (ECF 62), the defendant agrees that the base offense level is **6**, pursuant to U.S.S.G. §§ 2S1.1(a)(1) and 2B1.1(a)(2). The defendant asserts that he was responsible for loss of more than $550,000 but less than $1.5 million, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), and therefore a **14**-level enhancement applies. The defendant also asserts that a **2**-level enhancement applies, pursuant to U.S.S.G. § 2S1.1(b)(1)(2)(B), because the defendant is convicted of money laundering. *Id.* at 2.

In contrast, though the government agrees that the base offense level is **6** and a **2**-level enhancement applies because of the § 1956(h) conviction, the government submits that the intended loss was more than $3.5 million but less than $9.5 million, pursuant to U.S.S.G § 2B1.1(b)(1)(J), and thus a **18**-level enhancement applies. ECF 54 (Government's letter

4

regarding guilty plea).   In addition, the government submits that the following enhancements apply:

- A **2**-level enhancement, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii), because the offense resulted in substantial financial hardship to one or more victims.

- A **2**-level enhancement, pursuant to U.S.S.G. § 2B1.1(b)(10), because the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials, a substantial part of the fraudulent scheme was committed from outside the United States, and/or the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

- A **2**-level enhancement, pursuant to U.S.S.G. § 2S1.1(b)(3), because the offense involved sophisticated laundering.

In total, therefore, after **2**-levels for acceptance of responsibility,[3] the final adjusted offense level is **30**. The government agrees that the defendant is a criminal history category I, and therefore the final guidelines range is 97-121 months.

### A.     Legal Standard

Unlike a trial, at sentencing the standard of proof is a preponderance of the evidence. *United States v. Brooks*, 957 F.2d 1138, 1148 (4th Cir. 1992). The Fourth Circuit has repeatedly held, post-*Booker*, that the standard of proving sentencing guideline factors remains by a preponderance. *See, e.g., United States v. White*, 405 F.3d 208, 219 (4th Cir. 2005) ("In any

---

[3] The government does not intend to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease.

given case after Booker, a district court will calculate, consult, and take into account the exact same guideline range that it would have applied under the pre-*Booker* mandatory guidelines regime."); *United States v. Morris*, 429 F .3d 65, 72 (4th Cir. 2005) (holding that, post-*Booker*, district courts should apply a preponderance of the evidence standard, taking into account that the resulting guideline range is advisory).

Moreover, it is undisputed that at a sentencing hearing, the court may consider a "broad scope" of information. *United States v. Falesbork*, 5 F.3d 715, 722 (4th Cir. 1993). Since before the founding of our Nation, sentencing judges have relied upon a wide array of "'sources and types of evidence . . . to assist [them] in determining the kind and extent of punishment to be imposed within limits fixed by law.'" *Witte v. United States*, 515 U.S. 389, 397-98 (1995) (quoting *Williams v. New York*, 337 U.S. 241, 246 (1949)). As the Supreme Court articulated in *Witte*, "a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Id.* at 398 (internal quotations and citations removed).

This broad view as to the admissibility of evidence during sentencing is mandated in 18 U.S.C. § 3661, which states, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Both the U.S. Sentencing Guidelines and the Federal Rules of Evidence reiterate the broad range of evidence available for a court's consideration at sentencing, with the Guidelines permitting all relevant and reliable evidence. U.S.S.G. § 6A1.3(a) ("sentencing judges are not restricted to information that would be admissible at trial."); Fed. R. Evid. 1101(d)(3)

(exempting sentencing proceedings from the Federal Rules of Evidence). The Fourth Circuit's statement in *United States v. Bowman*, 926 F.2d 380, 381 (4th Cir. 1991), aptly summarizes this principle: "[t]he type of information to be considered by a sentencing judge is unlimited." Thus, a sentencing judge may consider any relevant and reliable evidence in determining a defendant's sentence.

In accord with this broad view of the admissibility of evidence, the Fourth Circuit has specifically held that reliable hearsay evidence is admissible at a sentencing hearing. *E.g., Bowman*, 926 F.2d at 381 (holding uncorroborated testimony was sufficiently reliable to be admissible at sentencing). For example, the Fourth Circuit has upheld a sentencing judge's reliance upon the testimony of officers who testify as to the content of interviews they conducted with individuals whose statements implicated the defendant. *E.g., United States v. Marshal*, 39 Fed. Appx. 903, 904 (4th Cir. 2002) (holding the sentencing judge's reliance upon a detective's testimony as to an individual's incriminating statements regarding the defendant was not clearly erroneous because other evidence corroborated the statements); *United States v. Randall*, 171 F.3d 195, 211 (4th Cir. 1999) (holding the district court did not err in relying upon a detective's testimony regarding a co-conspirator's statements because the sentencing judge believed that the statements were reliable); *United States v. Jackson*, 208 F.3d 210 (4th Cir. 1999) (holding the sentencing judge did not err in considering "testimony from a federal agent who summarized statements taken from co-conspirators charged in an earlier indictment.").

While *Crawford v. Washington*, 541 U.S. 36 (2004), bars the admission at trial of out-of-court testimonial statements made by individuals not subject to cross-examination, every Court of Appeals has held that the Confrontation Clause is not applicable to sentencing proceedings.

*United States v. Bras*, 483 F.3d 103, 109 (D.C. Cir. 2007) ("Nothing in Crawford suggests that the Court intended to overturn its precedents permitting the use of hearsay at sentencing. We are certainly not at liberty to do so."); *Luciano*, 414 F.3d at 179 (holding "[n]othing in Crawford requires us to alter our previous conclusion that there is no Sixth Amendment Confrontation Clause right at sentencing."); *United States v. Martinez*, 413 F.3d 239, 242-44 (2d Cir. 2005) (holding that Crawford and Booker "provide no basis to question prior Supreme Court decisions that expressly approved the consideration of out-of-court statements at sentencing."); *United States v. Wynn*, 214 Fed.Appx. 118, 121 (3d Cir. 2007) (holding "sentencing court's consideration of hearsay" did not violate the Confrontation Clause) (unpublished); *United States v. Fields*, 483 F.3d 313, 332 (5th Cir. 2007) (holding the "Confrontation Clause does not operate to bar the introduction of testimonial hearsay at noncapital sentencing."); *United States v. Katzopoulos*, 437 F.3d 569, 576 (6th Cir. 2006) ("there is nothing specific in . . . Crawford that would cause this Court to reverse its long-settled rule of law that [the] Confrontation Clause permits the admission of testimonial hearsay at sentencing proceedings."); *United States v. Roche*, 415 F.3d 614, 618 (7th Cir. 2005) (holding the Confrontation Clause is not applicable at sentencing because "witnesses providing information to the court after guilt is established are not accusers within the meaning of the confrontation clause."); *United States v. Brown*, 430 F.3d 942, 944 (8th Cir. 2005) (holding that Crawford "does not alter the pre-Crawford law that the admission of hearsay testimony at sentencing does not violate confrontation rights."); *United States v. Littlesun*, 444 F.3d 1196, 1200 (9th Cir. 2006) ("the law on hearsay at sentencing is still what it was before Crawford: hearsay is admissible at sentencing . . . ."); *United States v. Bustamante*, 454 F.3d 1200, 1202 (10th Cir. 2006) ("We see nothing in Crawford that requires us

todepart from our precedent 'that constitutional provisions regarding the Confrontation Clause are not required to be applied during sentencing proceedings.' (quoting *United States v. Hershberger*, 962 F.2d 1548, 1554 (10th Cir. 1992) . . . ."); *United States v. Chau*, 426 F.3d 1318, 1321-23 (11th Cir. 2005) (holding the admission of hearsay evidence at sentencing was not plain error because it did not violate the Confrontation Clause).

Unpublished opinions from the Fourth Circuit are harmonious with these decisions. *E.g., United States v. Debreus*, 255 Fed. Appx. 725, 727 (4th Cir. 2007) (holding defendant's argument that Crawford applies at sentencing is without merit) (unpublished); *United States v. Newbold*, 215 Fed.Appx. 289, 299 (4th Cir. 2007) (holding the sentencing judge's reliance upon testimonial hearsay at sentencing did not violate the Confrontation Clause) (unpublished).

Consistent with these principles, it is proper for the government to submit declarations to the Court as a result of a federal investigation and for the Court to rely on such declarations.

### B. Loss Amount

The defendant admits that he "assisted with attempted negotiation of nine checks with an aggregate value of well over $550,000." ECF 62. However, the defendant fails to account for the fact that the sentencing guidelines are driven not by actual loss, which the government agrees was over $550,000, but *intended* loss—which was greater than $6 million.

As the application notes to the Guidelines makes clear, the loss amount includes the greater of the actual or intended loss amounts. U.S.S.G. § 2B1.1, Application Note 3. In turn, intended loss is defined as "the pecuniary harm that the defendant purposefully sought to inflict." *Id.* Here, as set forth in the Rusakiewicz Declaration and Exhibit 2 attached thereto, it is clear that Mukong purposefully sought to inflict the loss of at least $6 million dollars—the amount

that was placed in the CL Escrow account. Rusakiewicz Declaration ¶¶ 20-26 and Ex. 2. Indeed, after Victim E wired $6 million into the CL Escrow LLC drop account, Fomukong sent Chinji and Mukong an audio clip indicating that there was a $6 million account balance, to which Chinji immediately responded (on the same three-way chat) with one of the fictitious businesses: "QPZTYX LINK CO." *Id.* Of those funds, the conspirators thereafter obtained and cashed six separate cashier's checks, each in the amount of $95,000, for a total of $570,000. *Id.* As such, the defendant's intended loss was greater than 3.5 million but less than $9.5 million.

An **18**-level enhancement applies.

C. **Substantial Financial Hardship**

U.S.S.G. § 2B1.1(b)(2)(A)(iii) provides for a 2-level enhancement where the defendant's offense "resulted in substantial financial hardship to one or more victims." The Guideline commentary, at Application Note 4(f) states that the non-exclusive factors to consider is whether the offense resulted in the victim:

> (i) becoming insolvent;
> (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);
> (iii) suffering substantial loss of a retirement, education, or other savings or investment fund;
> (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans;
> (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and
> (vi) suffering substantial harm to his or her ability to obtain credit.

Applying these factors, it is clear that **Victims A**, **B**, and **D**, at minimum, suffered substantial financial hardship due to Chinji's fraudulent conduct. All five Victims' statements regarding the

10

impact of this fraud on their lives are attached to the Rusakiewicz Declaration as Exhibits A through E.

**Victim A,** who is 66 years old, explains that he was defrauded into sending a $75,00 wire believing he was purchasing a retirement home. This money constituted the majority of the funds in **Victim A**'s savings account—none of which was recovered or reimbursed from the title company. Because **Victim A**'s primary residence was already under contract, in order to complete the purchase of the retirement, **Victim A** was forced to sell savings bonds and paid an extra $8,000 in taxes. Rusakiewicz Declaration ¶ 36 and Ex. A.

The spouse of **Victim B** explains that she and her husband were purchasing a home for a rental and investment property, with the hope that she would be able to work only part-time or be a stay-at-home mom to her 6 month old child. Unfortunately, because of the fraud, she has been forced to stay in full-time employment. Their total loss was originally approximately $250,000, though they have recovered approximately $72,000.[4]  Rusakiewicz Declaration ¶ 37 and Ex. B.

The spouse of **Victim D** explained in an email:

> That day was a big disaster in our life as we suddenly lost a big big amount of money and at the end no longer can buy the house as planned. It was totally out of our imagination that this happened on us. Almost all our savings saved from hard working in many years completely gone suddenly that day. We did had a very very hard feeling. It was the most scary matter in our life. We did suffer a lot, with tears and sadness, for quite a long time.

Rusakiewicz Declaration ¶ 38 and Ex. D.

---

[4] It is unclear to the government at this time where this $72,000 was "recovered" from, such as the bank, insurance, or some other source.

As such, the defendant's offense caused a substantial financial hardship to at least one victim, and a 2-level enhancement applies.

### D. Relocation, Commission Outside of the United States or Sophisticated Means and Sophisticated Laundering

U.S.S.G. § 2B1.1(b)(10) provides for a 2-level enhancement where the defendant participated in relocating a fraudulent scheme to another jurisdiction to evade law enforcement *or* a substantial part of the fraudulent scheme was committed from outside of the United States *or* the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. All three of these provisions are satisfied here.

Regarding the first provision, the cashier's checks were generally obtained in Maryland and then flown to Texas to be cashed in order to further the money laundering scheme and avoid detection by law enforcement. Rusakiewz Declaration ¶ 41. Moreover, as is set forth in Fomukong and his co-defendants' plea agreements, Fomukong, Eyong, and Cho all admitted under oath that a substantial part of the fraudulent scheme was committed from outside of the United States, namely South Africa. *Id.* ¶ 42; *see also* ECF Nos. 86 (Fomukong), 95 (Eyong), and 103 (Cho). This was further evidenced by wires sent to accounts outside the United States, including South Africa, Cameroon, and Poland. Rusakiewicz Declaration ¶ 42.

In addition, the fraud involved sophisticated means, in that it involved fictitious entities, corporate shells, and offshore financial accounts. *See* U.S.S.G. § 2B1.1(b)(10)(C), Application Note 9(B). For the same reason, the actions constituted sophisticated laundering, pursuant to U.S.S.G. § 2S1.1(b)(3). *See* U.S.S.G. § 2S1.1(b)(3), Application Note 5 (explaining that

"sophisticated laundering" "means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense" and typically involves the use of fictitious entities, shell corporations, two or more layering of transactions, or offshore financial accounts).

A 2-level enhancement pursuant to both U.S.S.G. § 2B1.1(b)(10) and U.S.S.G. § 2S1.1(b)(3) is therefore warranted.

### The Appropriate Sentence Pursuant to 18 U.S.C. § 3553(a)

If the Court credits the government's and the U.S. Probation Office's calculation of the Guidelines, the total offense level is **30**, after a 2-level of acceptance of responsibility. Because the defendant is a criminal history category I, the defendant's final guidelines are 97-121 months. At sentencing, the government anticipates that it will request that the defendant be sentenced to **78 months'** imprisonment, regardless of the sentencing guidelines, as such sentence is sufficient but not greater than necessary to achieve the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

In recommending a below-guidelines sentence, the government notes that, while Mukong is responsible for the intended loss of at least $6 million (and thus an 18-level enhancement), pursuant to plea negotiation with co-defendant Chinji, the government agreed to limit the loss to between $550,000 and $1.5 million, for a 14-level enhancement. In order to avoid unwarranted sentencing disparities, the government takes this into account in its sentencing recommendation. If one were to apply a 14-level enhancement, rather than an 18-level enhancement, the defendant's guidelines range is 63 to 78 months.

However, the government's recommendation also takes into account the fact that Mukong continued to engage in multiple frauds, even after the arrest of Mr. Fomukong. Indeed, as set forth in the Rusakiewicz Declaration, the defendant committed fraud unabated from the time he first arrived in the United States through the date of his arrest. Rusakiewicz Declaration ¶¶ 27-31 and Exhibits 4 – 10.

Specifically, the defendant arrived in the United States in January 2016, on a full-time student visa. The defendant enrolled in Oklahoma City Community College in Oklahoma, but then failed to enroll again in February 2017, becoming an illegal visa overstay. At some point thereafter (or perhaps before), the defendant relocated to Texas. Furthermore, in November 2016, the defendant filed a false asylum application in which the defendant indicated that he resided at an address in Maryland. Not only was the defendant purportedly in school in Oklahoma City at the time, but he also has never resided in Maryland. More importantly, the Maryland address the defendant put on his asylum application is associated with an individual who is the repeated target of investigation by immigration authorities for being a facilitator of fraud in immigration court. Then, again in April 2018, the defendant attempted to change his status by purporting that he was married to a United States citizen. That application was denied in December 2019. Rusakiewicz Declaration ¶ 28.

Furthermore, while illegally present in the United States, in addition to the fraud committed with Fomukong as described above, the defendant actively engaged in various additional fraud schemes until the very moment of his arrest. On the day of Mukong's arrest in May 2019, law enforcement also executed a search warrant at Mukong's residence—a residence that is not set forth in the defendant's Pretrial Services report—and seized Mukong's phone. To

illustrate some examples of the defendant's widespread and continuing fraud, Agent Rusakiewicz attaches Exhibits 4 – 10, which contain chats which were obtained from the defendant's phone that was seized on the date of his arrest. These chats unambiguously indicate that the defendant continued to engage in fraudulent activity, including business email compromise schemes, past December 2017, when some of Mukong's co-conspirators (including Fomukong) were arrested. Rusakiewicz Declaration ¶¶ 30. Indeed, in May 2019—just days before his arrest—Mukong confirmed that he was still involved in the "bank stuff."  *See* Rusakiewicz Declaration ¶ 30.d and Ex. Y. And, in addition to the BEC scheme, the defendant participated in additional fraud activity, including puppy mill scam and a non-delivery tire scam. Rusakiewicz Declaration ¶ 31 and Exs. 8-10.

Given that the defendant was not deterred by the arrest of Fomukong, as well as for other reasons to be further discussed at the sentencing hearing, a significant sentence—namely, 87 months—is appropriate.

In addition, the government will seek a restitution order in the amount of $929,986, which is the total amount of the victims' losses directly attributable to Mukong, as well as a forfeiture order in the amount of $30,000, in the form of a money judgment, as set forth in its motion for preliminary order of forfeiture, filed contemporaneously herewith.

        Respectfully submitted,

        Robert K. Hur
        United States Attorney

By:_____/s/_____
        Kelly O. Hayes
        Assistant United States Attorney

15