IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Case 19-cr-243-PWG |
| JOEL T. MUKONG | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OF REBUTTAL BY THE DEFENDANT

Counsel for the Prosecution argues that a sentence of 87 months is an appropriate sentence for the Defendant, Joel Mukong. Counsel's argument relies *inter alia* on a recitation of the guidelines which assigns culpability for an intended range of loss higher than that of Mr. Jason Chinji, who received 46 months, and is by all accounts a conspiratorial superior to Mr. Mukong in this case. The prosecutrix also relies on the argument expressed in it's plainest form that Mr. Mukong presents a particular danger to the community because he engaged in fraud after the arrest of Mr. Fomukong, essentially demonstrating an incorrigibility that can only be addressed with an incapacitating sentence. Both of counsel's arguments are logically unsound and Mr. Mukong urges the Court reject them and sentence him to no more than 23 months confinement.

Alleged Uncharged Wire Fraud

The most significant allegation in the Prosecution's sentencing submission is the contention that Mr. Mukong engaged in an uncharged business email compromise scheme in September 2018. The only actual evidence of this is a record of communications between Mr.

Mukong and a single phone number identified as "Swiss" with the +237 country code prefix. (+23 country code as identified in the FBI Affidavit does not exist.)  The +237 country code is from Cameroon.  The Prosecution identifies this as a Cameroonian national, and it is.  The number belongs to Jason Chinji, the co-accused in this case.

The chat in question takes place on Whatsapp, a mobile phone application provided by Facebook that allows communication between any two numbers so long as there is an internet connection.  Mr. Chinji registered a telephone number established in Cameroon, but he can and did use that number to chat with any person, wherever he was located and wherever they were located so long as they were both connected to the internet.

The chat in question recounts an interaction where Mr. Chinji has requested that Mr. Mukong assist him in checking an account number because Mr. Chinji was driving at the time of his request.  Mr. Mukong who was also driving assisted Mr. Mukong shortly after the initial request.  Mr. Mukong did not know then and still does not know the source of the funds or their ultimate disposition.  The prosecution further bolstered this series of text messages with the affidavit of an FBI agent who opined with far less brevity that 'it looked like fraud.'  The prosecution seems to acknowledge the paucity of actual evidence by spending pages of the their sentencing submission explaining that the Court may hear evidence in sentencing that is otherwise constitutionally inadmissable.

The Court may of course consider a broad amount of evidence at sentencing but it need not credit that evidence equally with that proven during the determination of guilt.  Prosecution Exhibit 1 interprets some of the text messages seized from Mr. Mukong's phone in May of 2019 adding nothing in independent investigation.  As this February 2021 hearing approaches the Prosecution has had nearly two years to corroborate any aspect of it's "charge" that Mr. Mukong

engaged in wire fraud in September 2018.  Two years to subpeona BB&T transfers; two years to verify that the account numbers and or social security numbers are active and valid; two years to ask the check cashing witnesses who clearly assisted with the instant case whether there were other checks and other companies; two years to find any evidence other than a few text messages seized on the day of arrest that this was a real offense, with real victims, involving real money and they've reported nothing.  The reputation for professionalism, integrity, and thoroughness of the FBI is well known and well deserved.   The defense submits that the absence of any evidence corroborating these claims is in fact evidence of absence of such corroboration.

Other Alleged Schemes

  A similar observation can be made for the other allegations in the Prosecution's sentencing submission.  There is no corroborating evidence of any of the communications found in tthe text messages from the defendant's phone, only more incriminating "interpretations" by SA Rusakiewicz.  Further the allegations never solicit any money, or otherwise identify any actual victim of fraud.  The sums under discussion for website support are almost universally under one hundred dollars.

  Prosecution Exhibit 1 also details what it describes as a criminal transactions in Prosecution Exhibit 6, where Mr. Mukong, who never had more than $2,000 in his bank account, is blithely moving, in the FBI agent's estimation, hundreds of thousands of dollars around through "burned" wire transfers, PayPal, Zelle, and even "bitcoin."   There is again no evidence such sums ever existed.  In fact the $500,000 alleged by the FBI is actually 500,000 Central Cameroonian Francs a sum worth then roughly $1,000 in American currency.  Paypal limits transactions to $10,000 and then only for bank verified accounts, Zelle limits transactions to

$1,000 per day, and no evidence was ever found that Mr. Mukong was a "Bitcoin miner," or was a member of a Bitcoin exchange, or had a media device encrypted or otherwise that contained any so called "cyber currency."

Argument Regarding Sentence Impact of Uncharged Misconduct

Even if, *arguendo*, we credit the prosecution's thinly sketched assertion that Mr. Chinji was back at it, ostensibly without Mr. Fomukong, and Mr. Mukong was again his adminstrative assistant.  The addition of the apparent intended loss in this exchange would not change the actual guidelines range in this case of $550,000 to $1.5 million dollars, nor would it budge the astronomical contention by the prosecution that the intended loss is $3.5 to $9 million.  The paltry sums discussed in the allegations that Mr. Mukong provided material support to other schemes such as a counterfeit canine mill would have negligible effect on the guidelines in this case.

The prosecution's further contention, that it shows a wanton disregard for lawfulness on the part of Mr. Mukong flies in the face of common sense.  The prosecution would have you believe that Mr. Mukong was aware when Mr. Fomukong was arrested and because of his criminal complicity with Mr. Fomukong he would have to know exactly why Mr. Fomukong was arrested.

That would have led him to understand that from March 2018 on he had extreme criminal exposure.  The prosecution has also asserted that Mr. Mukong was connected to a broad network of international criminal figures in Hungary, Kenya, and Cameroon and further he had access to upwards of half million U.S. dollars and yet he did nothing.  Knowing that it was only a matter of time before the FBI would check on the payees of 90% of the wire fraud proceeds, the

Prosecution would have you believe he stayed put in Houston, TX, living at the same apartment, using the same phone, knowingly running a variant of the same scheme.

Ignoring the utter absence of corroboration of the Prosecution's "fever dream," it is simply more plausible that Mr. Mukong had no idea that he was in trouble because he thought that while Mr. Fomukong's questionable schemes had at last caught up with him, they had nothing to do with him.  He simply did not understand, until he was detained and had an opportunity to digest the money laundering statute, that helping Mr. Fomukong was illegal.  His inquiry, however naive, stopped when he believed that Mr. Fomukong was drawing on legitimate accounts to issue checks.  That truthful formulation provides no basis to 'aggravate' Mr. Mukong's sentence because of brazen contact.  Mr. Mukong is now chastened and contrite and he has grave respect for the punitive powers of the United States.

Sentence Parity

The least supported aspect of the Prosecution's submission is the contention that Mr. Mukong, who had no role in the wire fraud, the "quiet guy," who is clearly subordinate in this conspiracy to Mr. Chinji should receive 87 months in confinement, nearly twice that of Mr. Chinji and the longest sentence of any member of the allied cases to date.  Even if the Prosecution's allegations of uncharged misconduct were true, that sentence would offend the 18 U.S.C. § 3553(a) sentencing factors, and is logically and morally unjustified.  As if to underline the gross disparity of the Prosecution's request in this case, on the day the Prosecution submission was filed the U.S. District Court for the Southern District of New York sentenced David Correia, to one year in jail for his part in a scheme that resulted in an actual loss of $2.3 million from investors.  (Exhibit 3 - Correia Article)   Mr. Correia's efforts netted him $50,000

by his own admission. That is $20,000 more than the prosecution's most inflated assertion of what they calculate Mr. Mukong could have retained and it more than 7 times what he actually did.

      Mr. Fomukong is a University graduate, father, and husband, who has made positive contributions to his community and his fellow man. He is non-violent and has never faced the considerable sanctions of the criminal justice systems before this incident. There is no reasonable argument that an additional period of years in confinement would benefit Mr. Mukong, protect the public, or impress upon him that it is unacceptable to play a role in facilitating theft.

Other Considerations

      The U.S. Court of Appeals for the District of Columbia Circuit has held that a Court may depart from the sentencing guidelines when a defendant's deportable status will impact his conditions of confinement. U.S. v. Smith 27 F.3d 649 (D.C. Circ. 1994). It is certainly foreseeable that Mr. Mukong will be swiftly transferred to an Immigrations and Customs Enforcement facilty. It is likewise foreseeable that that facility will be far less resourced than an equivalent Bureau of Prisons Facility. Mr. Mukong has made solid use of his time at the Central Treatment Facility (Exhibit 1 - Letters of Achievement, CTF) and would avail himself of programs at a BoP facility that would not only cheer his time but potentially shorten his sentence due to the First Step Act provisions. None of those programs would be available at a facility for deportable inmates.

      Since the filing of Mr. Mukong's sentencing memorandum forty members of the U.S. Congress have requested that the Department of Homeland Security grant Temporary Protected

Status to Cameroonian nationals in the United States (Exhibit 2 - Congressional Letter).  The Secretary of Homeland Security has not made any public reply to the request and relief materializing in time for Mr. Mukong is speculative at best.  The letter does illustrate the dire condition that Mr. Mukong will likely find himself in shortly after his expulsion from the United States.

      WHEREFORE, Defendant respectfully requests a sentence of no more than 23 months confinement.

                        Respectfully submitted,

                        /Signed
                        KWASI HAWKS, Bar # 13902
                        The Hawks Firm
                        8705 Colesville Road, Suite 162
                        Silver Spring, Maryland  20910
                        Tel:  (310) 433-5577

                        Email: kwasihawks@hotmail.com